The next case on our morning's calendar is number 20-2579, Kravitz v. Tavlarios. Mr. Collins. Good morning. Good morning. This is Jason Collins for Appellate Kravitz, as trustee of the Aegean Litigation Trust. May it please the court. This case involves a breach of fiduciary duty claims against three directors and one officer who served as pawns for a known criminal named Millicentitis. The complaint specifies at paragraph 26 that they were all close associates of Millicentitis with knowledge of his criminal background and agreed to be the public face of the company when his rap sheet prevented him from doing so through an IPO, knowing full well that Millicentitis would remain in charge through a side agreement. As the complaint specifies at paragraph 28, the defendant's prior experience with Millicentitis and knowledge of his criminal background necessitated controls, reporting, and oversight by the fiduciaries fashioned in view of the reality that they were overseeing a known criminal. Instead, the complaint details how they stood by in 2013 and 2014 as the budget and timing for the company's major storage facility project in the UAE inexplicably doubled with virtually all of the overage representing misappropriations by Millicentitis. That's at paragraphs 37 through 39. As explained further at paragraph 39, defendants turned a blind eye to Millicentitis' fraud. Thereafter, they stood by as he perpetrated a fake receivable scheme to cover his fraudulent activity with sham transactions incapable of being performed at the reported volumes, seven times what the facility could actually process. In all, the complaint alleges that they stood by as Millicentitis misappropriated over $300 million from the company over the course of numerous years. This case is not about a small one-time theft by a random underling. The complaint specifies how both the cost overruns and the inflated receivables constituted material irregularities in the company's financial statements. Which the defendants are presumed to know. They did nothing to intervene or investigate despite all the reported cost overruns and the unexplainable ballooning receivables that occurred over a multi-year period. Now the court must determine whether it can constitute a breach of fiduciary duty for directors or an officer to allow a known criminal to have his way with the company without monitoring, overseeing, or intervening in his activities in the midst of a material financial irregularities pointing to significant ongoing financial fraud and misappropriation. The court below found that the mere fact that the company hired an outside auditor and claimed to have an audit committee insulated them from any duties to monitor or act. The district court also found that steps taken much later in time by completely different people to unravel the fraud somehow insulates the defendants from liability. These holdings are inconsistent with both the law and the alleged facts of the case. RMI law, which is applicable here because it's an RMI company, provides in Section 61 of its Business Corporations Act at Appendix 80, that directors and officers shall carry out their duties with the degree of diligence and skill which ordinarily prudent people would exercise under similar circumstances in like positions. The key point I want to draw the court's attention to there is that circumstances matter. Both RMI and Delaware, which is persuasive authority for RMI, make specific reference to the circumstances being important. Thus, in considering the sufficiency and the plausibility of the allegations, the court must take into account the circumstances of this case where associates of a known criminal are stepping in to hold the official seats of fiduciary power while still allowing the criminal to act for the company pursuant to a side agreement. Those circumstances matter and constitute an important part of what the court must take into account, drawing all inferences in the appellant's favor. Can I ask you a question or a couple of questions? Yes, Your Honor. Thank you. I'm sorry I had mooted myself, but I heard you clearly. Just a couple of questions. I understand that the Corbett case from the Delaware Chancellery seems to hold that director in action, but implicate a duty of care and not just the duty of loyalty. But how do you respond to the view that that case is an outlier? Many Delaware courts, and also the Ninth Circuit, seem to hold that the duty of loyalty is the only basis upon which one can make a claim for failure to oversee. Well, Your Honor, what I would do is point the court to the cases that deal directly with inaction being a basis for a breach of duty of care claim such as McPadden, which has been cited to the court at 964A, 2nd, 1274-75, which makes the point very clearly that a breach of the duty of care can result from, quote, reckless indifference, which is the very type of inaction alleged in this case. And what's happening here with respect to both the court's decision below and the argument of appellees is an attempt to blur the distinction of the duties, a duty of care being a gross negligence claim with a duty of loyalty, particularly one involving bad faith, involving something other than and more than with a higher burden than simply gross negligence through reckless indifference. But blurring that distinction is at the core of what's happening with the decision below. I think that distinction is made clear both in McPadden and also in the Delaware's Disney cases, both the Supreme Court's Disney opinion at 906A, 2nd at 65, and also even what Chancellor Chandler had to say in the Chancery Court Disney decision about the distinction between the claims, which has been reaffirmed by the Delaware Supreme Court in Stone v. Ritter. And the bottom line is that you typically don't see the duty of care through reckless indifference or just gross negligence claims being adjudicated all the way through by the Delaware courts because in almost all of those cases there's an exculpation that would apply with respect to the simple plain vanilla gross negligence case. That's an exculpation that doesn't exist here, as we've argued to the court, because there's no exculpation clause in the company's articles, which is required in order for there to be an exculpation for very good policy reasons. If we look at Care Mark Prong 1, which has to do with the lack of controls or monitoring, the complaint as I read it, and correct me if I'm misunderstanding, acknowledges that Aegean had an auditing committee and hired reputable outside auditors, and it concedes, as I understand, that the auditing mechanism eventually detected the fraud, although perhaps too late to prevent it. Isn't Delaware precedent clear that this prong is met only if the corporation lacked any controls? If you look at Stone v. Ritter, the existence of normal auditing functions is typically sufficient for the first Care Mark Prong, Marchand v. Barnhill. Why should we reach a different outcome here? Well, Your Honor, first of all, it is not the case that simply having an auditor or an audit committee satisfies the requirement of a Prong 1 Duty of Loyalty claim, even if we're talking about it as a Prong 1 Care Mark claim. You have to understand or look to what particular controls are we talking about, and as I pointed out in my opening, the circumstances matter. It's not just any type of control, and particularly I would point out with respect to an auditor, an auditor's role is to look retrospectively at what occurred in a prior year, to say that having an auditor, which is simply a requirement to list on a stock exchange, that that would then absolve directors from any potential Prong 1 liability under Care Mark, would obviously have far-reaching implications. These are the fiduciaries. These are the ones that are supposed to have foresight. They're the ones that are supposed to determine under the circumstances, looking back to the standard of care, what would a reasonable person do under these circumstances where you're allowing a known criminal to run the show? You would actually institute controls that matter with respect to the legal risk that he's going to be misappropriating funds in connection with the company's major project, or that the financial systems are actually going to catch the extent to which receivables are going to balloon to the tune of $200 million through sham transactions through entities that he's controlling, because that's a known, with good, reasonable foresight risk associated with having a known criminal run the company under your watch. We would disagree with the notion that any control, such as the existence of an auditor who looks retrospectively at prior years, satisfies your Prong 1 duty. Excuse me, could I follow up on that? This is Judge Carney. I wondered what case you would point to in Delaware, interpreting Delaware law, that suggests that Stone and Marshand, that standard articulated there, that any monitoring system at the board level is really sufficient to defeat a care mark claim based on the first condition, that there's a modified standard that's more demanding in certain circumstances. I've seen that in Delaware law. What would you point to? Yes, well, Your Honor, I'm glad that you actually mentioned Marchand itself. I mean, I would look at the Delaware Supreme Court's opinion in Marchand at 212.83.805, where that opinion itself demonstrates how the existence of some mandated regulatory controls do not make directors immune from liability if they fail to monitor what was clearly important in the context of the case. In that case, in Marchand, it was the lack of food safety monitoring. Here, in this case, it's a failure to monitor mellicinitis in the context of the biggest things he was running at the company that were systematically spiraling out of control over a multi-year period. And so I believe that looking at Marchand itself will show how a particular control may not be the control that you actually need in the context of the given case because there were regulatory requirements at play there that they met and others that were not controlled. And so I think you'll see the distinction there, and I think it's consistent with what we're dealing with in this case in terms of blurring the distinction of the duties or perhaps importing higher hurdles. A lot of the cases that are cited to this court and argued deal with derivative claims that have a higher burden, demand futility determinations that have a higher burden, or issues of operational risk versus legal risk, such as the Rawlins case or even this court's opinion in Wayne County. And so there's a different standard applied in terms of what type of controls are expected of directors with respect to operational risk as opposed to the type of legal risk we have here. And we just submit that the court needs to be careful at not allowing those distinctions to be blurred or to import higher hurdles that should not apply in the context of this case for breach of fiduciary duty under the various duties that is to be weighed under a Rule 8 standard with all inferences to be decided in favor of the plaintiff. And I'm going to reserve the rest of my time. Go ahead. Just a quick response, if possible, from you. I mean, generally, in the rare instances where Delaware courts find normal auditing functions insufficient, the company had no controls for a mission-critical risk that is central to the company's operations. And so, as you say, in Washington, the ice cream company had no food safety controls. Where is there an indication here that theft prevention or accounting integrity was AGN's central mission? Well, what's most important is what we've alleged about the lack of there being any sufficient controls over the particular financial reporting and the type of activity that the known criminal was undertaking. And so we're at the pleading stage. And so accepting our allegations is true. The question is not really can the defendants bring forward some factual dispute about whether or not these directors were actually looking and monitoring various things. There's nothing in the record that is properly in the record for the court to consider at that point. Through discovery, we're obviously going to get far more information about what they were thinking, what they were doing, what they were saying to each other at the time that the known criminal was systematically looting the company to the tune of $300 million. But right now, what we have are the allegations that they failed to actually monitor, oversee, or intervene in activities related to his running of the company's major project and essentially the company's financial position, because when you look at the receivables, as a point I've already made, this is not a material one-off financial fraud. This is a systematic looting over a period of years that tanked the company. Judge Gatzman, anything further before we let Mr. Collins sit down as it were? No, thank you. Very good. You have preserved a little time for rebuttal, Mr. Collins. We'll hear from Mr. Goldberg. Good morning, Your Honors. May it please the Court, this is Joshua Goldberg from Patterson, Belknap, Webb & Tyler, and we represent Defendant Nicholas Tavlarios. With the Court's permission, I will be arguing on behalf of all four individual defendants. Your Honors, plaintiff trustee brought this action seeking to hold the defendants liable for a fraud that they had nothing to do with and are not alleged to have known about. Plaintiff's theory is that the defendants failed to adequately monitor AGM's business and, as a result, did not uncover a fraud that was allegedly perpetrated by AGM's founder, Mr. Malcinides. The complaint specifically highlights the many ways in which Mr. Malcinides concealed his fraud, all for the purpose of evading the company's controls and deceiving others, including the defendants and the company's auditors. The plaintiff alleges that if the officer directors had proactively investigated in some unspecified way and if they had had the foresight to scrutinize unspecified documents and if they had recognized irregularities that were not clear on the face of those documents, they might have discovered the fraud earlier. In a comprehensive and well-reasoned opinion, Judge Buchwald properly found that these allegations do not make out a claim for breach of fiduciary duty. Accordingly, after carefully considering plaintiff's allegations and applying the relevant law, Judge Buchwald dismissed the case. That decision should be affirmed. First, Mr. Goldberg, could you address the allegations in the complaint that Mr. Malcinides had pre-existing business relationships with each of the defendants before they were appointed to the board? You know, he had criminal convictions. He was required to resign before the dean could launch its IPO. Weren't there red flags all over the place about financial risks, integrity risks, that constitute circumstances requiring a more robust review and audit system at the get-go? Isn't the framework agreement itself such a red flag? Could you address that concern, please? Yes, thank you, Your Honor. I do want to address that because Mr. Collins obviously spent quite a bit of time on that and I think may have used the words known criminal at least a dozen times. Your Honor, these allegations have taken quite a journey since the complaint and it's important to look at what plaintiffs actually allege. With regard to the relationship between the defendants and Mr. Malcinides, what is actually alleged in what Mr. Collins has referred to as being close associates, what's alleged is that each of the four had had prior involvement with a different company called General Maritime Corporation, which is alleged to have been a customer of an AGM predecessor. And that's it. That's the full extent of the allegation with regard to their close association. And so, for example, my client, Mr. Tablerios, Nicholas Tablerios, had served as the vice president for General Maritime Subsidiary. And that's the connection that they are alleging creates a close relationship, a close association. With regard to the prior misconduct and the repeated refrain that Mr. Malcinides was a known criminal, it is true that there were issues raised about Mr. Malcinides' background. And it's true that those issues were fully disclosed prior to the IPO, including with regard to the framework agreement. But of note, and Judge Buchwald specifically addressed that, the allegations of this prior conduct amounted to conduct that was, in some cases, decades before the alleged fraud that occurred here, and so far removed and remote from the type of conduct that it was basically irrelevant. And in that respect, wasn't a red flag at all. So, for example, there were three convictions that predated the IPO. And those were the only three times that Mr. Malcinides has been convicted of criminal conduct. That's the known criminal allegation. One is from 40 years ago in 1980. He was convicted of bribing two players in an amateur soccer game. Not long after that, in 1988, he was convicted of participating in connection with bribing a civil servant in connection with operating a driving school. And then in 1999, over 15 years before the relevant event here, he was convicted for illegally operating a condemned warehouse. So, without minimizing this conduct, the point is that these things are so far removed from the type of the conduct that's alleged here that they're really not red flags at all. In addition, there were controls put in place specifically with regard to that, including, as I mentioned, the framework agreement. There is no dispute because it's specifically alleged in the complaint that there was, in fact, an audit committee, a board of directors that they met regularly, that this company hired, under the defendant's leadership, two outside auditors, two big four accounting firms, Deloitte and PwC, which on an annual basis reviewed the company's consolidated financial report and the sufficiency of its controls, and year after year after year issued unqualified opinions in connection with the company's financials. And when issues were identified, the defendants, under their leadership, remedied those issues. So, there just is not an allegation in this complaint, as Judge Buchwald found. There just wasn't a sufficient allegation that there had been either a failure to implement controls or to sufficiently monitor those. I do want to, if I... Yes, please. I think Judge Katzman has a question. Judge Carney, did I interrupt you at all? No, no, I was wanting to make room for you, Judge Katzman. I thought I heard your voice. Thank you. Are you contending that director inaction can never amount to a duty of care claim? We're not, and thank you, Judge Katzman. I was actually just going to turn to that because I know the question that you asked, Mr. Collins. We do not, and we take that position. We didn't take the position in the brief that a failure to act can never constitute a duty of care claim. And, you know, the cases are not always a model of clarity on this, but there is a clear line, and it is the framework for the analysis makes clear where a failure to act could rise to the level of creating a duty of care claim. And the key distinction is whether or not there's been an affirmative decision, which clearly could raise a duty of care claim. That's not alleged here at all. Or a conscious decision not to act. And the framework for analyzing those decisions, the decision not to act itself being a formal decision, is whether it receives the benefit of the business judgment rule. But whereas here, there's no decision that's been challenged. The duty of care just isn't implicated at all. And I think that that's where the cases that Mr. Collins referred to and, for your honor, referred to, that's where the line seems to be drawn in. So those cases in which a so-called inaction was found to potentially rise to the level of the breach of the duty of care, there was a conscious decision based on information and a conscious decision not to act. The TIBCO case from the Chancery Court, which the plaintiff relies on here and relied on extensively below, is sort of the perfect example of that. That's a case where the board of directors had been put on notice that there had been a significant accounting error with regard to a transaction that the company was about to enter into. And it materially impacted the valuation of the assets that they were about to acquire. And there were allegations that the defendant's directors were specifically put on notice of that accounting error, deliberated about it extensively, and then inexplicably decided to go ahead with the transaction anyways. So in that situation, arguably, there's inaction because they didn't stop the transaction. But that case stands for the proposition that where there is a conscious decision not to act, that it may rise to the level of duty of care. But that's not our case at all. There just is no decision that they've identified. There's no failure to act with regard to a particular decision that's been alleged. And so Judge Buchwald was entirely correct in finding that this just isn't a duty of care claim. In doing that, at page 20 of her decision, she noted that plaintiffs themselves repeatedly referred to this as a failure to monitor theory. Complaint paragraph 1, that they abdicated their duties to oversee without any monitoring, oversight, or scrutiny. Paragraph 6 of the complaint, defendant's failure to monitor. Paragraph 45 of the complaint, defendant's failure to oversee and monitor. Paragraph 76, they should have acted long before to monitor and control. So clearly, this is a case about alleging a failure to monitor, and so it properly falls under the care mark standard. And with regard to the care mark standard, I'm happy to go into detail, but my time may be close to running out. You have about a minute. You have about a minute left if you'd like to wrap up or address anything further. Thank you, Judge Kearney. Just briefly, Judge Buchwald meticulously went through each of the prongs of the care mark standard. I believe in the exchange with Mr. Collins, you already addressed the fact that the plaintiff could not make out the standard for utterly failing to implement any controls. And similarly, Judge Buchwald properly found that plaintiffs had not alleged that having implemented such controls, they consciously failed to monitor them, meaning that acting in bad faith, they knew that they were not properly monitoring the company and were consciously disregarding their duties. So unless the court has any further questions, we are happy to rest on our papers, and we urge the court to affirm the decision dismissing the complaint with prejudice. Thank you very much, Mr. Goldberg. Mr. Collins, you've reserved one minute for rebuttal. Thank you. So I understand the appellee's desire to minimize or even step in to try to defend Melissinides' prior criminal conduct. What matters is what has been alleged in the complaint. That was called into question. I'd direct the court to Appendix 19, Paragraph 26 of the complaint, where it's alleged that these particular defendants were handpicked by Melissinides to step in as the fiduciaries when he couldn't do so. And it says, quote, before joining Aegean, each defendant was a close associate of Melissinides with knowledge of his suspect background, and each fully understood the terms of the framework agreement and the reality that Melissinides retained power over their positions at Aegean, end quote. In addition, the argument that appellees are making and also the decision of the court below continues to blur the distinction of the duties that are at play here in terms of duty of care versus duty of loyalty. One of the arguments that appellees made is that this case, even at a duty of care level, requires a showing of conscious disregard of one's duties. I direct the court to the McPadden case again, looking at the specific quote that that court makes about the distinction between duty of care as gross negligence, including reckless indifference, as compared to the duty of loyalty standard, which involves the, quote, conscious disregard of one's duties. The conscious disregard falls under the duty of loyalty rubric when you're forced to show good faith. And so there just needs to be a, I just want to remind the court of the distinction of these duties because they are being blurred here. And the court below unambiguously applied an incorrect standard by stating on special appendix page 27 of its opinion that, quote, the plaintiff must plead with particularity that there were so-called red flags that put the directors on notice of problems, citing the General Motors derivative action case. That may be required in a derivative action case under Chancery Rule 23.1, but it doesn't apply here. Oddly, the parties here disagree on whether the lower court made the statement, but the court can obviously read page 27 of the opinion itself. And we request that the court apply notice pleading standard under Rule 8, recognizing this is a 12B6 motion where inferences are to be decided in favor of the plaintiff and not a summary judgment case, a case after trial like Disney. It's certainly not a demand futility case. It's not an operational risk case. This is a case where, again, fiduciary stepped in to serve the role, recognizing that they had a known criminal running the shop, and they didn't put in place the right controls, and they did nothing as the company spiraled out of control, losing $300 billion over a period of many years. We respectfully request that the court reverse the decision below. Thank you. Thank you. Thank you very much. Well argued both Mr. Collins and Mr. Goldberg. We will reserve decision.